

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-18-00195-CV

———————————————————

IN THE INTEREST OF V.S., A CHILD

———————————————————

On Appeal from County Court at Law No. 1
Parker County, Texas
Trial Court No. CIV17-0330

———————————————————

Before Gabriel, Kerr, and Birdwell, JJ.
Memorandum Opinion by Justice Kerr

## MEMORANDUM OPINION

Father and Mother appeal the trial court's order appointing Larry and Mary Adams, non-parent relatives, as the managing conservators of their son, V.S.[1] In the same order, the trial court appointed Father and Mother as possessory conservators. Father and Mother raise issues arguing that the trial court abused its discretion in finding that neither of them, separately or jointly, should be appointed as V.S.'s managing conservators. Concluding that the evidence sufficed to support the trial court's findings, and thus that no abuse of discretion occurred, we affirm.

## I. Background

### A. Mother and her children

Mother has three children; at the time of trial, none of them was in her custody.

When Mother gave birth to V.S. in May 2016, both she and her newborn son tested positive for methamphetamine. The Texas Department of Family and Protective Services responded by removing V.S. and Mother's other son, Tom. Mother's third child, Ann, was in her father's (Duke's) custody. By the time V.S.'s case came to trial, Mother had already relinquished her parental rights to Tom.

---

[1]To protect the privacy of the parties in this case, we identify the child by his initials, other family members (including the related non-parent managing conservators) by fictitious names, and the parents simply as Father and Mother. *See* Tex. Fam. Code Ann. § 109.002(d) (West Supp. 2018).

**B. Father and his children**

Besides V.S., Father had two other children, a son and a daughter. Father's ex-wife was their primary caretaker. Father described his 20-year-old son as an "addict" and said that he and his son were nothing alike, which he attributed to his son's not having been under Father's care.

When Mother gave birth to V.S., Father was 80% sure that he was V.S.'s father, but he entertained doubts because Duke had told him that Duke might in fact be V.S.'s father. On June 1, 2016, the trial court ordered genetic testing, but Father waited six months, until January 2017, to provide a genetic specimen. About ten months after V.S.'s removal, Father finally learned in March 2017 that V.S. was his child.

**C. How Father and Mother responded to her pregnancy**

Mother described the moment she told Father that he might be her baby's father as "very stressful," and when asked if he had responded negatively, she answered, "A little bit." Although Mother had received prenatal care for Tom and Ann, she admitted not having sought any while pregnant with V.S.

**D. Mother's drug history**

At the time of trial in November 2017, Mother was 31 and had been using methamphetamine sporadically since she was 17. She maintained that she was clean at times, denied using drugs while pregnant with Tom and Ann, and asserted that she was sometimes drug-free for long stretches, stating that after Tom's birth she was

3

clean for six years and also for about three years after Ann's birth. But Mother admitted using drugs while pregnant with V.S. Father even watched her use methamphetamine once when she was eight-and-a-half to nine months pregnant.

This case was not the first time that drugs had led the Department to become involved in her life: in 2012 she had a case with Tom and Ann. She admitted going to counseling in 2012, getting her FBSS[2] case successfully discharged, but later relapsing.

### E. Father's drug history

Father was 41 and had used methamphetamine off and on since his middle 20s. Like Mother, he claimed lengthy periods of sobriety from drugs, one spanning six years and another lasting four years.

But when he got laid off from his job in 2014, his meth use "got bad," and by 2016, "it got real bad." Despite V.S.'s birth and removal in May 2016, Father admitted to having been high from July 2016 through the second weekend in February 2017.

### F. Father and Mother disengage after the Department removed V.S.

Department caseworker Andrew Johnson, who was on the case from May 2016 until August 2017, testified that he had contact with both Father and Mother at the adversary hearing—the first statutorily required hearing after a child's removal[3]—at

---

[2]Family-based safety services. *See* Tex. Fam. Code Ann. § 264.202 (West 2014) (addressing services for less serious cases); *In re A.W.*, No. 02-18-00147-CV, 2018 WL 5074770, at *1 (Tex. App.—Fort Worth Oct. 18, 2018, no pet. h.) (mem. op.).

[3]Tex. Fam. Code Ann. § 262.106 (West Supp. 2018).

4

the end of May 2016.[4] Mother appeared for a visit with V.S. that same week, but Johnson then lost contact with her until January 14, 2017, when he went to see her in jail. Except at the adversary hearing, Johnson had no contact with Father until March 2017, when he called to give Father the paternity-test results.

### G. The Department finds a family placement—the Adamses

While Father and Mother were out of the picture, through Mother's father's assistance the Department found a family placement for V.S. with Larry Adams and his wife Mary, who is Mother's cousin.

The placement was not without some initial hiccups. Duke resurfaced and caused an unspecified "incident" that concerned the Adamses and made them hesitate, but after they overcame their reservations, the Department placed V.S. with them on October 29, 2016. After the placement, Mary testified, she and her husband had never looked back.

### H. Mother goes to jail and pleads guilty to attempted assault on a public servant

On January 14, 2017, Mother found Father at their home with one of her female friends, got angry, and—according to Mother—went after her friend with a golf club. Father suffered a small knife cut in the process, but Mother could not remember how that happened. In any event, Mother admitted that there was domestic violence between her and Father.

---

[4]The adversary hearing was actually on June 1, 2016.

Mother acknowledged at trial that she was arrested for domestic assault and for attempted assault on a public servant; she ended up pleading guilty to the latter charge and the assault charge against Father got dismissed. When asked to describe what she had done that led to her arrest for an attempted assault on a public servant, she responded, "When I got arrested [for the assault on Father], I kicked the door so they said that I had an attempted assault on a public servant." She served over three months in the Parker County jail and got out in May 2017.[5] By this point, she had not cooperated with Johnson enough for him to develop a service plan much less for her to have worked any services.

In contrast to Mother, Father recalled the events of January 14 with greater detail: "I was sitting there on the couch beside this girl. . . . We were asleep. And then [Mother] came in the door and pretty much like she said, with the golf club. And then I didn't see the [pocket] knife until after I took the golf clubs out of her hand." Father added, "I took the golf clubs away. And in the scuffle she just scratched my hand with the knife. I didn't have no paramedics called or nothing. It was just a scratch."

At the time, although he and Mother were living in the same house, both agreed that they were not necessarily a couple. Father maintained that the woman he was with was just a friend, but in his statement to the police, he described her as an

_____

[5]This was not Mother's first trip to a jail. She had spent a few days in the Tarrant County jail in 2012 on a possession charge, and the police arrested her in 2013 for traffic tickets. Her two older children were present when she was arrested for possession in 2012.

"ex-girlfriend." In his statement, Father also reported that Mother was "screaming at the top of her lungs" and indicated that he wanted to file charges against her, but at trial he acknowledged that the charges went away and that he never had to testify against her.

### I. Father goes to jail and pleads guilty to possession

Despite V.S.'s birth, but before having his paternity confirmed, Father was still involved with drugs. In late February 2017, the police kicked in the door to his house and raided it. The police arrested Father, and he later pleaded guilty to possession of less than one gram of methamphetamine. The trial court sentenced Father to 24 months in a state-jail facility, probated for three years, and a $1,000 fine.

### J. Jail becomes a watershed experience for both Father and Mother

Mother testified that going to jail made her step back and reevaluate things. In jail, she got mental-health help, was diagnosed with depression, and was prescribed the antidepressant Zoloft, which she said made a difference. Between Mother's release from jail and the trial date, she had not tested positive for drugs, and so January 14, 2017—the date she was arrested—became her sobriety date.

Father, too, described going to jail as a life-altering experience. He testified that while he was lying in jail, "looking at the ceiling, . . . that was it. That's all it took for me. Before I never got in trouble. If I would have got in trouble earlier, it probably would have been then when I made that decision." He elaborated, "When . . . they kicked in my door, I had already been clean a week. Laying up there looking at the

7

ceiling, [I] said I'm not doing this ever again. No ifs, ands, or [buts]. I'm not touching meth or any other drug ever again."

**K. Father and Mother work services**

Once out of jail in May 2017, Mother immediately asked Johnson for service-provider information and actively worked her services. And once Father received the DNA results in late March 2017, he told Johnson that he wanted to participate in a service plan. Johnson created one, Father signed it in April, and Father immediately started performing his services.

Even though Father and Mother were both actively working their services, Johnson told them that no matter what they did, the Department would not change its goal. Despite that, neither quit, both kept working services, and both stayed clean.[6]

**L. Visits resume in June 2017**

Shortly after her release from jail, Mother saw V.S. for the first time in about a year. Less clear is how long Father went without seeing V.S.

Both Mother and Father testified that Father had seen V.S. at the hospital in May 2016. Father described visiting V.S. with Mother, so presumably he too started visiting V.S. in June 2017 or shortly after.

---

[6]*See A.W.*, 2018 WL 5074770, at *14 n.17 (addressing parent's complaint that he had no motivation to work services because the caseworker and FBSS worker had told him that the Department would not change its position even if he completed them).

**M. V.S. has medical needs**

While in foster care before his placement with the Adamses, V.S. developed "flat head," a birth condition technically called plagiocephaly, and had to wear a helmet to correct it. According to Mary Adams, the "flat head" itself was related to another condition known as hypertonia, which she described as basically low muscle tone or "floppy baby." To help with this condition, every week V.S. was receiving three therapies—two physical and one occupational. In addition to the therapy sessions, the Adamses and their two other children worked with V.S. daily. Due to his condition, V.S. did not learn to crawl until he was 11 months old, which Mary said was considered delayed, but by 13 months, he had learned to walk.

At the time of trial, V.S. was already on the Adamses' health insurance even though the Department had not required such coverage as a condition of V.S.'s placement.

**N. Stability of Father's and Mother's relationship**

Mother testified that after she gave birth to V.S. in May 2016, her relationship with Father was "on and off" until February 2017, at which time she described them as becoming a couple again. They were not married and had never held themselves out as married. Mother described their current relationship as happy and close, and Father echoed Mother's assessment by describing it as "great." Father's sister and Johnson agreed that Father and Mother appeared to have a good and healthy relationship.

**O. Relative risks posed to V.S.**

Johnson acknowledged that any danger to V.S. had nothing to do with Father's and Mother's present conduct. By the end of August 2017, Johnson further acknowledged, Father and Mother's home had appropriate accommodations for a child, and Father and Mother had done everything on their service plans that they could have.[7]

But as Johnson explained, permanence matters greatly to children, and the Adamses, who wanted to adopt V.S., offered that permanence. By comparison, Johnson asserted, placing a child with parents who later relapse is "[l]ess permanent."

When Johnson left the case in August 2017, he thought that appointing either parent as managing conservator would have risked harming V.S. significantly, either emotionally or physically. In so opining, Johnson relied on Father's and Mother's criminal history and on the criminal charges for which they were arrested. He further noted the number of times that Father and Mother had been incarcerated and commented that incarcerated parents were not able to care for their children. Johnson next cited the fact that neither parent engaged in V.S.'s life during the first year, and he thought that Father's paternity concerns should have made little difference. (As noted earlier, Father was 80% certain he was V.S.'s father, but he nevertheless waited

---

[7]Consistent with these observations, the court-appointed special-advocate (CASA) worker, Linda Garrett, advocated for essentially a monitored return, that is, "a gradual return where the parents are held accountable, and to do certain things to plan for his return."

about six months before submitting a genetic sample. And Johnson had told Father that Father could work services despite not being genetically tested.) Johnson also relied on the duration of both parents' drug use and the fact that both had previously relapsed. From working as the caseworker on Tom's (Mother's other son's) case, Johnson was also concerned that Father might have been using drugs on a daily basis while Tom was living with Father and Mother.

According to Lindsey Beckman, Father's and Mother's individual and couple's therapist, relapses are fairly common. And if one parent relapsed, she testified that it might impact the other. When asked if she would trust her own child, or if she would ask someone else to trust their child with Father and Mother, Beckman declined to answer, stating that she was not able to predict future negative behavior.

Mother agreed that if she used again, she expected both Father and his sister to "throw [her] under the bus." Father articulated it differently: "I'll just boot her out. [V.S.] will stay with me." If Father used again, Mother said that she would leave him, probably go to a friend's home, and get a job.

Both Father and Mother testified to their opinion that removing V.S. from the Adamses would not harm him. Mary Adams thought, to the contrary, that changing V.S.'s placement would greatly traumatize him emotionally—in part simply because of his age and in part because of the depth of the bond he had developed with her and her husband. And according to Johnson, removing children from placements generally was traumatic and harmful to them.

**P. Procedural facts; trial-court findings**

In early October 2017, the Adamses intervened in this case and sought to terminate Father's and Mother's parental rights to V.S.

At the end of that month, the Department sought leave to file an amended original petition in which it still sought to terminate Father's and Mother's parental rights.

And on November 6, 2017, the morning of trial, Father moved for—and the trial court granted—leave to file a first amended answer and counterclaim in which he sought managing conservatorship. On the same date, the Department announced that it was no longer seeking to terminate either parent's parental rights, was opposing managing conservatorship in either parent, and was seeking to have the Adamses appointed managing conservators. The Adamses, unlike the Department, announced that they were still seeking termination or, alternatively, sole managing conservatorship.

The trial court did not terminate Father's and Mother's parental rights but instead made the Adamses V.S.'s sole managing conservators and made Father and Mother possessory conservators.

Regarding conservatorship, the trial court made the following factual findings:

23. There is credible evidence of a history of domestic violence between [Mother] and [Father].

24. There is credible evidence of a history of past physical abuse by [Mother] directed against [Father].

12

. . .

39. Appointment of [Mother] and [Father] as joint managing conservators of the child would significantly impair the child's physical health or emotional development.

40. Appointment of [Mother] as sole managing conservator of the child would significantly impair the child's physical or emotional development.

41. Appointment of [Father] as sole managing conservator of the child would significantly impair the child's physical health or emotional development.

42. It is in the best interest of the child, [V.S.], that Intervenors, [Larry and Mary Adams] be appointed the non-parent Sole Managing Conservator of the child.

The trial court made the following corresponding conclusions of law:

3. [Mother] and [Father] may not be appointed joint managing conservators of the child the subject of this suit as credible evidence has been presented to the Court of a history or pattern of physical abuse by one parent directed against the other parent.

4. [Mother] has not presented sufficient evidence to rebut the presumption that she may not be appointed sole managing conservator of the child the subject of this suit as sufficient credible evidence has been presented to the Court of a history or pattern of physical abuse by her against the other parent.

5. In addition to the preceding conclusions of law, the Court concludes that appointment of [Mother] and [Father] as joint managing conservators of the child would significantly impair the child's physical health or emotional development.

6. Appointment of [Mother] as sole managing conservator of the child would significantly impair the child's physical health or emotional development.

7. Appointment of [Father] as sole managing conservator of the child would significantly impair the child's physical health or emotional development.

13

8. It is in the best interest of the child that [Larry and Mary Adams] be appointed non-parent sole managing conservator of the child the subject of this suit.

## II. Issues on Appeal

Father presents two issues: First, "Did the trial court abuse its discretion in determining that appointment of Father as sole managing conservator or as a joint managing conservator of the child would significantly impair the child's physical health or emotional development?" And second, "Did the trial court err in determining that Mother and Father were precluded from being appointed joint managing conservators of the child where no evidence was presented that Father engaged in family violence?"

Mother raises one issue: "The trial court abused its discretion in determining that appointment of Mother and Father as Joint Managing Conservators, or either of them as Sole Managing Conservators, would significantly impair the child's physical health or emotional development."

## III. Standards of review

### A. Conservatorship standard of review

We review conservatorship determinations for an abuse of discretion and may reverse those determinations only if they are arbitrary and unreasonable. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007); *In re S.T.*, 508 S.W.3d 482, 489 (Tex. App.—Fort Worth 2015, no pet.). Legal and factual insufficiency are not independent grounds for asserting error under the abuse-of-discretion standard here but are merely relevant

factors in assessing whether the trial court abused its discretion. *S.T.*, 508 S.W.3d at 489. We first inquire into the evidentiary sufficiency. *Id.* Next we determine whether, based on the elicited evidence, the trial court decided reasonably. *Id.*

## B. Factual-findings standard of review

We apply a preponderance-of-the-evidence standard to factual findings. Tex. Fam. Code Ann. § 105.005 (West 2014) ("Except as otherwise provided by this title, the court's findings shall be based on a preponderance of the evidence.").

We may sustain a legal sufficiency challenge only when (1) the record shows that evidence supporting a vital fact is completely absent; (2) legal or evidentiary rules bar us from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the vital fact's opposite. *S.T.*, 508 S.W.3d at 489 (citing *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999)). In determining whether legally sufficient evidence supports a finding, we consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *Id.* at 489-90 (citing *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007)).

When a party asserts that the evidence is factually insufficient to support a finding, we will set it aside only if, after considering and weighing all pertinent record evidence, we determine that the credible evidence supporting the finding is so weak or

so contrary to the overwhelming weight of all the evidence that it should be set aside and a new trial ordered. *Id.* at 490 (citing *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986)).

In a bench trial, the trial court acts as the factfinder, and we give its factual findings the same weight as a jury's verdict. *Advance Tire & Wheels, LLC v. Enshikar*, 527 S.W.3d 476, 480 (Tex. App.—Houston [1st Dist.] 2017, no pet.); *In re A.E.A.*, 406 S.W.3d 404, 414 (Tex. App.—Fort Worth 2013, no pet.). When, as in this case, there is a complete reporter's record, challenged factual findings are binding only if legally and factually sufficient proof supports them. *Advance Tire*, 527 S.W.3d at 480; *In re J.M.C.*, 395 S.W.3d 839, 844 (Tex. App.—Tyler 2013, no pet.). But unchallenged factual findings bind an appellate court—unless the contrary is proved as a matter of law or there is no evidence to support the finding. *Advance Tire*, 527 S.W.3d at 480; *In re E.R.C.*, 496 S.W.3d 270, 288 (Tex. App.—Texarkana 2016, pet denied), *cert. denied*, 137 S. Ct 834 (2017). The trial court evaluates and resolves any evidentiary inconsistencies. *In re S.J.R.-Z*, 537 S.W.3d 677, 691 (Tex. App.—San Antonio 2017, pet. denied); *Advance Tire*, 527 S.W.3d at 480. It alone judges witnesses' credibility. *Advance Tire*, 527 S.W.3d at 480; *E.R.C.*, 496 S.W.3d at 284. It may accept all, reject all, or accept only parts—rejecting other parts—of a witness's testimony, based on the record before it. *Advance Tire*, 527 S.W.3d at 480. If the evidence is subject to reasonable disagreement, we will not reverse. *Id.*

## IV. Conservatorship

### A. Joint managing conservatorship

Section 153.004 of the family code provides in pertinent part: "The court may not appoint joint managing conservators if credible evidence is presented of a history or pattern of past or present child neglect, or physical or sexual abuse by one parent directed against the other parent . . . ." Tex. Fam. Code Ann. § 153.004(b) (West Supp. 2018). We have held that a "single act of violence or abuse can constitute a 'history' of physical abuse for purposes of section 153.004(b)." *In re R.T.H.*, 175 S.W.3d 519, 521 (Tex. App.—Fort Worth 2005, no pet.); *see also Avalos v. Avalos*, No. 02-08-00012-CV, 2008 WL 5115300, at *2 (Tex. App.—Fort Worth Dec. 4, 2008, no pet.) (mem. op.).

Here, the trial court found "credible evidence of a history of domestic violence between [Mother] and [Father]," although this finding did not ascribe blame to either parent. This finding determines whether section 153.004(b) applies. *See* Tex. Fam. Code Ann. § 153.004(b).

Although Mother testified that she was attacking the woman Father was with, and not Father himself, she also admitted that she and Father had engaged in domestic violence and that she was arrested for domestic assault. Father described Mother's assaulting him with golf clubs and a pocket knife, during which scuffle the knife cut him slightly. Because a single incident can constitute a "history of family violence," and because their testimony constitutes more than an evidentiary scintilla—

17

and is in fact quite strong, especially when considering that the trial court could have disbelieved Mother's testimony that she was attacking the other woman and not Father—we hold that both legally and factually sufficient evidence supports this finding. *See Advance Tire*, 527 S.W.3d at 480; *S.T.*, 508 S.W.3d at 489; *R.T.H.*, 175 S.W.3d at 521; *Avalos*, 2008 WL 5115300, at *2.

And because the statute absolutely prohibits joint managing conservatorship under these facts, the trial court did not abuse its discretion by determining that Father and Mother could not be appointed as V.S.'s joint managing conservators. *See* Tex. Fam. Code Ann. § 153.004(b); *see In re D.M.*, No. 02-16-00473-CV, 2017 WL 1173847, at *1 (Tex. App.—Fort Worth Mar. 30, 2017, no pet.) (mem. op.) ("Credible evidence of [family violence involving the child's parents] absolutely prohibits the appointment of the parents as joint managing conservators."). We thus overrule those portions of Father's and Mother's issues in which they complain of the trial court's not appointing them joint managing conservators.[8]

## B. Mother as sole managing conservator

Another portion of family-code section 153.004(b) addresses sole managing conservatorship:

---

[8]We also overrule Father's second issue, in which he claims that the trial court erred by "determining that Mother and Father were precluded from being appointed joint managing conservators of the child where no evidence was presented that Father engaged in family violence," because *Father's* conduct is irrelevant on this point. Section 153.004(b) precludes joint managing conservatorship if *either* parent has engaged in family violence, something the credible evidence shows on Mother's part, as we discuss below.

> It is a rebuttable presumption that the appointment of a parent as the sole managing conservator of a child . . . is not in the best interest of the child if credible evidence is presented of a history or pattern of past or present child neglect, or physical . . . abuse by that parent directed against the other parent, a spouse, or a child.

Tex. Fam. Code Ann. § 153.004(b). The trial court's finding of "credible evidence of a history of past physical abuse by [Mother] directed against [Father]" determines whether the above portion of section 153.004(b) applies to Mother.

As discussed, the evidence legally and factually sufficed to support the finding that Father and Mother engaged in domestic violence, but our discussion of that finding did not require determining who the perpetrator was. This one does.

Mother admitted that she engaged in domestic violence with Father, and Father described Mother's assaulting him with golf clubs and a knife. Although Mother hedged on whom she intended to assault, the trial court as the factfinder was free to disbelieve her testimony that she intended to attack the other woman and not Father. *See Advance Tire*, 527 S.W.3d at 480. Because both Mother's and Father's testimony constitutes more than an evidentiary scintilla and strongly identifies Mother as the attacker, we hold that both legally and factually sufficient evidence supports the trial court's finding of physical abuse directed toward Father. *See S.T.*, 508 S.W.3d at 489.

### C. Appointment of either Father or Mother; "significant impairment"

In light of the evidentiary support for the trial court's physical-abuse finding, there was a rebuttable presumption that appointing Mother sole managing conservator was not in the child's best interest. *See* Tex. Fam. Code Ann. § 153.004(b).

Because Father was not the parent who engaged in domestic violence, he did not labor under the same rebuttable presumption.

The trial court found:

40. Appointment of [Mother] as sole managing conservator of the child would significantly impair the child's physical health or emotional development.

41. Appointment of [Father] as sole managing conservator of the child would significantly impair the child's physical health or emotional development.

Absent these findings, family-code section 153.131(a) would have required the trial court to appoint either Father or Mother as sole managing conservator. *See* Tex. Fam. Code Ann. § 153.131(a) (West 2014).

### 1. Applicable legal principles

Section 153.131(a) provides:

(a) Subject to the prohibition in Section 153.004, unless the court finds that appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development, a parent shall be appointed sole managing conservator or both parents shall be appointed as joint managing conservators of the child.

*Id.*; *see In re V.L.K.*, 24 S.W.3d 338, 341–42 (Tex. 2000) (stating that under family code chapter 153, a nonparent can rebut the parental presumption by showing that appointing the parent would significantly impair the child's health or development). The section 153.131 parental presumption rests on the natural affection that parents and their children usually share. *V.L.K.*, 24 S.W.3d at 341; *see S.T.*, 508 S.W.3d at 491.

20

Impairment must be proved by an evidentiary preponderance indicating that some specific, identifiable parental behavior or conduct, shown by specific parental acts or omissions, will probably cause that harm. *Critz v. Critz*, 297 S.W.3d 464, 474 (Tex. App.—Fort Worth 2009, no pet.); *see also In re K.R.B.*, No. 02-10-00021-CV, 2010 WL 3928727, at *4 (Tex. App.—Fort Worth Oct. 7, 2010, no pet.) (mem. op.). Examples of significant impairment are parental physical abuse, severe neglect, drug or alcohol abuse, or immoral behavior. *See In re De La Pena*, 999 S.W.2d 521, 528 (Tex. App.—El Paso 1999, no pet.). Proving significant impairment is a heavy burden; merely showing that the nonparent would be a better custodian of the child does not satisfy it. *Critz*, 297 S.W.3d at 474–75. Courts should decide "close calls" in the parent's favor. *Id.* at 475.

Discussing the "significantly impair" standard, the supreme court in *Lewelling v. Lewelling* held that non-parents seeking custody must identify some act or omission that the parent committed showing that naming the parent as managing conservator will significantly impair the child's physical health or emotional development. 796 S.W.2d 164, 167–68 (Tex. 1990);[9] *see S.T.*, 508 S.W.3d at 491. In *Lewelling*, being unemployed and living in crowded conditions were not enough to show significant impairment; neither were two visits to a mental health hospital when there was no

---

[9] *See J.A.J.*, 243 S.W.3d at 616 ("Section 153.131(a) . . . imposes a more general standard that does not enumerate specific acts or omissions by the parent, but instead requires the court to find that appointing a parent would not be in the child's best interest because it would 'significantly impair the child's physical health or emotional well-being.'").

21

showing of mental problems; and being a spousal-abuse victim was not enough either. 796 S.W.2d at 167 (holding that evidence did not show significant impairment in custody battle between paternal grandparents and mother).

Providing a counterweight to *Lewelling* is *Danet v. Bhan*, in which the supreme court held that evidence showing

- the parent's conduct from two or three years earlier, plus

- other more recent conduct—not visiting the child and not communicating with the child consistently—as well as

- that the child had bonded with his foster parents,

- that the foster parents provided a stable environment, and

- that the foster placement itself resulted from the parent's acts and omissions,

all constituted evidence supporting the trial court's finding that placing the child back in the parent's custody would significantly impair the child's physical health or emotional development. 436 S.W.3d 793, 797–98 (Tex. 2014); *see S.T.*, 508 S.W.3d at 492.

Beyond the types of acts and omissions already mentioned (physical abuse, severe neglect, etc.), other considerations involving significant impairment may include parental irresponsibility; a history of suicidal thoughts and mental disorders; frequent moves; bad judgment; child abandonment; and an unstable, disorganized, and chaotic lifestyle that has put and will continue to put the child at risk. *S.T.*,

22

508 S.W.3d at 492; *In re R.R.*, No. 02-13-00464-CV, 2014 WL 3953930, at *3 (Tex. App.—Fort Worth Aug. 14, 2014, no pet.) (mem. op.).

The material time to consider is the present, and evidence of past conduct may not, by itself, suffice to show present unfitness. *S.T.*, 508 S.W.3d at 492.; *Critz*, 297 S.W.3d at 475; *see K.R.B.*, 2010 WL 3928727, at *11 (holding that although mother's past criminal conduct and drug use were relevant, they did not show that appointing her managing conservator about twenty months later, after she had multiple negative drug tests, would significantly impact the child's physical health or emotional development); *In re S.W.H.*, 72 S.W.3d 772, 778–79 (Tex. App.—Fort Worth 2002, no pet.) (stating that none of the evidence regarding the mother's actions more than four years earlier showed that appointing her as the child's managing conservator at present would significantly impair the child's physical health or emotional development when (1) the evidence was uncontroverted that the mother had remained clean and sober since entering drug treatment and (2) there was uncontroverted evidence that she had maintained steady employment, had a safe and stable home environment, and after her release from treatment had bonded with the child during visitations). If the parent is presently suitable to have custody, the fact that the parent would have been unsuitable at an earlier time is not controlling. *Critz*, 297 S.W.3d at 475.

But this principle is qualified by the permissible inference that an adult's future conduct may well be measured by his recent deliberate past conduct as it may relate to

the same or a similar situation. *May v. May*, 829 S.W.2d 373, 377 (Tex. App.—Corpus Christi 1992, writ denied) (citing *De Llano v. Moran*, 333 S.W.2d 359, 361 (Tex. 1960)). Indeed, specific harmful actions or omissions could hardly be shown without referring to the parent's recent behavior. *Id.*

### 2. Discussion

No one disputed at trial that both Father and Mother had been clean for about nine and ten months, respectively. And although both professed the ability and desire to stay clean, the trial court could have given their testimony little weight in view of other testimony that relapses are common and, more specifically, that both Father and Mother had relapsed in the past. *See Advance Tire*, 527 S.W.3d at 480.

Illustrating the tension between weighing a parent's past bad conduct and purported present rehabilitation is the supreme court's *De Llano* opinion. 333 S.W.2d at 359. The evidence there showed that father drank to excess throughout his marriage, was known to drive his vehicle fast, and thought he was capable of driving after consuming large amounts of alcohol because, in his own estimation, he held his liquor well. *Id.* at 360–61. Tragedy struck when the father, after drinking alcohol, drove into a freight train because he did not see it, killing his wife. *Id.* at 361.

After the fatal accident, the maternal grandparents sought custody of the father's and now-deceased mother's child. *Id.* at 360. They succeeded in the trial court, but the father appealed, and the appellate court reversed and rendered in his favor. *Id.* Persisting, the maternal grandparents petitioned the supreme court.

In the high court, the grandparents obtained the relief they sought when the supreme court reversed the court of appeals and affirmed the trial court's judgment. *Id.* at 361. The supreme court wrote, "The [appellate court] evidently [erroneously] gave considerable weight to [the father's] testimony indicating that there has been a change in his attitude and behavior since the death of his wife. The trial court was not required to believe such evidence, however, because the hearing occurred less than three months after the accident." *Id.* The supreme court added, "A person's conduct during so brief a period affords no basis for saying with any assurance that there has been a permanent change in his character and habits." *Id.*

Although Father and Mother are to be commended on their progress, and we encourage them on that path regardless of this case's outcome, as *De Llano* shows the trial court was not required to believe that the danger had passed. *See id.* Indeed, Mother testified that depression was a trigger for her drug use, that while incarcerated she was diagnosed with depression and prescribed Zoloft, that the Zoloft admittedly helped, but that she stopped taking it after her release, believing that she no longer needed it. When hearing this testimony, the trial court openly questioned her judgment. And Father testified that although he was an addict at one time, he no longer was. This testimony—Father's denying that his addiction problem persisted despite other testimony that relapses were fairly common and that Father himself had previously relapsed—could have reasonably raised red flags too.

25

Complicating Father's and Mother's situation was the fact that they were living together. Although they currently had a stable relationship, their history—even within the past year—was one of an on-again-off-again relationship. And if one were to relapse, each said that they would separate, which would inject additional instability into any child's life. Another possibility is that one's relapsing might facilitate the other's relapsing.

V.S. was only about 18 months old at the time of trial and thus extremely vulnerable, particularly in light of his hypertonia. While neither parent worked services for the first year; while Mother sat in jail; and while Father delayed in providing a DNA sample, V.S. deeply bonded with the Adamses. Mary Adams testified that removing V.S. from their home would greatly traumatize him emotionally, and Johnson testified that removal generally is traumatic and harmful to children. Although Father and Mother thought otherwise, the trial court was not required to give their testimony any weight. *See Advance Tire*, 527 S.W.3d at 480.

Although Father and Mother do not raise an appellate issue challenging the Adamses' appointment as V.S.'s sole managing conservators, the trial court found that they met all his needs, that he had deeply bonded with them, and that their home provided V.S.—a child with medical needs—stability and dedication. *See Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976); *see also Danet*, 436 S.W.3d at 797 ("We also consider the evidence that the child has bonded with [foster parents] in a stable

26

environment and the emotional harm that could result from the child's separation from those who have cared for him most of his life . . . .").

In contrast, neither Father nor Mother had met V.S.'s needs for at least the first year of his life. Father and Mother's relationship was currently stable, but they were not married and had a rocky history. The domestic-abuse incident appeared to be an isolated one, but it nevertheless occurred—and while the case was pending, at that.

Despite Father's and Mother's great strides toward turning their lives around, the trial court could reasonably question their ability to continue to do so. Moreover, given their neglect during the first year of V.S.'s life, the trial court could reasonably fear the consequences to V.S. if they slipped up. *See Danet*, 436 S.W.3d at 797 ("This evidence [showing placement would substantially impair the child's physical health or emotional development] includes [the mother's] conduct in the more distant past, two or three years before the . . . trial. . . . But it also includes evidence of [the mother's] more recent conduct prior to trial. . . .").

In short, making either parent the sole managing conservator was a risk. The parents' prior transgressions were many, serious, and recent. Because there was more than an evidentiary scintilla and because the credible evidence supporting the trial court's findings is not so weak or so contrary to the overwhelming weight of all the evidence, we hold that the evidence suffices legally and factually to support the findings that appointing either Father or Mother sole managing conservator would significantly impair V.S.'s physical health or emotional development, and that the trial

court did not abuse its discretion by so finding. *See S.T.*, 508 S.W.3d at 489. Accordingly, we overrule Father's and Mother's issues in which they each argue that the trial court abused its discretion by declining to appoint either of them as a sole managing conservator.

## V. Conclusion

We overrule Father's and Mother's issues and affirm the trial court's order.

/s/ Elizabeth Kerr

Elizabeth Kerr
Justice

Delivered:  November 29, 2018